UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   *Plaintiff*,

   *vs.*           Case No. 25-mj-376 (SCD-JPS)

TIMOTHY BEA,

   *Defendant*.

## RESPONSE TO GOVERNMENT'S MOTION FOR *DE NOVO* REVIEW OF PRETRIAL RELEASE ORDER

   On April 18, 2025, police in Milwaukee arrested Timothy Bea. Four days later, Bea appeared in court on a criminal complaint. At his detention hearing on April 23, 2025, Magistrate Judge Stephen Dries entered an Order releasing Bea with various conditions, consistent with the recommendation of pretrial services. Despite the release order, Bea remains in custody as a result of the government's request for a stay while it appeals the Magistrate Judge's ruling.

   The government's 20-page brief requesting review of the release order is based almost entirely on a description of the government's case and the weight of the evidence. As in most cases, the government's case appears facially strong, although Bea is in no position to contest it having not received the discovery. But the weight of the evidence is the least compelling factor to be considered in the bail analysis as it often has little relationship to a person's danger to the community or flight risk, and the Bail Reform Act

commands that the presumption of innocence shall be respected. *See* 18 U.S.C. § 3142(j). Given that well over 90% of persons charged in federal court are convicted, few people would be released if the weight of the evidence was a predominant factor.

The evidence proffered by the government is that Bea possessed drugs and firearms. There are no allegations that he engaged in violence or threats of violence at any time in his life, let alone as part of these alleged offenses. The government does not allege that Bea used firearms towards others. Bea isn't a felon—in fact, he has no criminal record at all—and his possession of firearms itself is not illegal. He had a valid CCW permit at the time of his arrest. He has strong community ties. He owns a home, where he resides with his mother. He owned businesses in Milwaukee. He has several children in Milwaukee and a long-term, stable relationship.

Ultimately, the government's detention request is premised on its claim that drug dealing—of fentanyl in particular—is inherently dangerous, but it fails to appreciate that the decision whether to release someone on bail is forward looking. That is, the government must show not that the person did something dangerous in the past; it must prove he "poses a *concrete, prospective* threat to public safety." *United States v. Munchel¸* 991 F.3d 1273, 1280 (D.C. Cir. 2021) (emphasis added). As the Seventh Circuit recently stated, "the pretrial detention decision must be based on an assessment of the risk that [a person] poses to the community in the future, not simply the riskiness of his alleged offense." *United States v. Lewis,* No. 23-2137, 2023 WL 4351244, at *1 (7th Cir. July 5, 2023). Ultimately, the government fails to show by clear and convincing evidence that there is

2

*no* combination of conditions that could "reasonably assure" the safety of the community, or by a preponderance of the evidence, Bea's appearance in court. Thus, he must be released.

I. Argument

**A. The presumption is easily rebutted and places only a "light burden" of production on the defendant**

One of the two reasons the government gives for detaining Bea is that he has not rebutted the presumption of detention that applies in this case. While there is such a presumption here, as there is in virtually every drug prosecution, the Seventh Circuit has stressed the presumption only "places *a light burden* of production on the defendant," and the "burden of persuasion always rests with the government." *United States v. Wilks*, 15 F.4th 842, 847 (7th Cir. 2021) (emphasis added). Indeed, even "an unrebutted presumption is not, by itself, an adequate reason to order detention." *Id. Wilks* reaffirms what courts in this district have long recognized, that this "burden of production is not a heavy one to meet." *See United States v. Hammond*, 204 F. Supp. 2d 1157, 1161 (E.D. Wis. 2002).

It's worth taking a step back to parse out exactly how the presumption operates. Typically, the government is tasked with proving by a preponderance of evidence that a person charged with a crime poses a risk of flight or, by clear and convincing evidence, that they are a danger to the community. In presumption cases, instead of providing direct and particularized evidence of risk of flight or danger, the government can instead make an initial showing that the charged offense falls within the category of cases

3

identified by Congress—here, a drug case punishable by at least 10 years in prison. *See* 18 U.S.C. § 3142(e). But that is only the beginning, not the end, of the inquiry.

What the law provides is that once the government makes the necessary showing that the presumption applies, the defendant, who otherwise would carry no burden at all, must "come forward with *some* evidence that he will not flee or endanger the community if released" to rebut the presumption. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added). "*Any* evidence favorable to the defendant" relevant to the § 3142(g) factors can rebut the presumption, "including evidence of their marital, family, and employment status, ties to and role in the community, clean criminal record, and other types of evidence." *Id.* That also would include any "evidence of economic and social stability." *Id.*

Here, Bea has rebutted the presumption of detention by evidence that he has no prior record, owns a home, has family in the area, and has a stable employment history. There also is no evidence of any violent conduct or threats at any time by Bea. The bond study also recommends release with conditions requiring drug and alcohol testing, restrictions on travel, and surrender of his passport. And Magistrate Judge Dries further ordered additional conditions of location monitoring and curfew.

**B. Once the presumption is rebutted, it carries little weight, particularly here.**

Once the presumption is rebutted, it does not act as a *presumption* at all. Instead, it becomes just one evidentiary factor among many others. *See Dominguez,* 783 F.2d at 707; *United States v. Jessup,* 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United*

4

*States v. O'Brien,* 895 F2d 810 (1st Cir. 1990) ("[T]he presumption is but one factor among many"). When it was adopted in the Bail Reform Act of 1984 (BRA), the presumption reflected Congress's factual finding that "flight to avoid prosecution [was] particularly high among persons charged with major drug offenses" and those individuals posed a "significant risk of pretrial recidivism." S. Rep. No. 225, 98th Cong., 1st Sess. 19 (1983). Specifically, Congress was concerned that "because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside of the United States from whence most dangerous drugs are imported, these persons have both the resources and foreign contacts to escape to other countries with relative ease in order to avoid prosecution." *Id.* at 16.

But these findings should hold limited weight today, particularly in cases like Bea's, for several reasons. First, Bea is different in kind from the type of drug trafficker Congress intended to target when it first created the presumption. Indeed, transcripts of congressional hearings on the BRA show the sheer magnitude of drug trafficking Congress was considering when it debated the need for the presumption of detention. The chair of the Subcommittee on Crime for the House Judiciary Committee, Representative William J. Hughes, for example, noted that "[t]o a narcotics defendant, a money bond of $1.5 million may be easy to post, and no great loss to forfeit in exchange for avoiding prosecution." *Hearings before the House Judiciary Committee on the Bail Reform Act 1981-1982*, 97th Cong. 59 (1981) ("1981 Hearings"). Similarly, Representative Harold Sawyer, a staunch supporter of amending bail laws to address drug trafficking, noted

5

that the drug trade had become a multi-billion-dollar industry, and the "biggest business in the State of Florida," leading traffickers to forfeit bail amounts set as high as "$20-odd millions," treating the loss "more or less as an expense of doing business." *Id.* at 136. These quotes put the presumption into perspective. Put simply, "legislators wanted the drug presumption to prevent rich people suspected of high-level drug trafficking from fleeing to avoid prosecution." Erica Zunkel, Alison Siegler, *The Federal Judiciary's Role in Drug Law Reform in an Era of Congressional Dysfunction*, 18 Ohio St. J. Crim. L. 283, 292 (2020).

It's important for courts to keep in mind the decidedly narrow approach Congress was intending to take when it adopted the BRA and the presumption. Indeed, at the time of the BRA's passage, Congress "ma[de] clear that to minimize the possibility of a constitutional challenge, the drafters aimed toward a *narrowly-drafted* statute with the pretrial detention provision addressed to the danger from a 'small but identifiable group of particularly dangerous defendants.'" *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (emphasis added) (quoting S. Rep. No. 98-225, at *6 (1983)). And this caution from Congress was well founded. The BRA was the first time in the nation's history, after all, that Congress authorized courts to consider dangerousness in bail decisions at all—a concept that many legal scholars, judges, and lawmakers at the time warned was concerning and possibly unconstitutional. *See* U.S. Senator Sam J. Ervin, Jr., *Preventative Detention – A Step Backward for Criminal Justice*, 6 Harv. Civil Rights-Civil Liberties L. Rev. 291, 292 (1971) (calling bills allowing for preventative detention based on dangerousness

"an illustration of what happens when politics, public fear, and creative hysteria join together to find a simple solution to a complex problems"); 1981 Hearings at 131, Testimony of NYU Professor James George ("When it comes to the matter of preconviction release, I think the more that a presumption of detainability is used, the more [constitutionally] vulnerable it may become."); 1981 Hearings at 102, Testimony of Yale Law Professor Daniel Freed ("If you authorize the denial of bail in noncapital cases, you will, after 192 years, be changing federal law, and before you reach the question of constitutionality . . . the question is, What do you know today that Congressman didn't know in 1789 . . .? What is it that is new about dangerousness . . .?"). Though the constitutionality of the BRA and preventative pretrial detention based on dangerousness was eventually upheld by a divided Supreme Court in *United States v. Salerno*, 481 U.S. 739, 750 (1987), the Court emphasized that the act "*narrowly* focuses on a particularly acute problem," and that it operated "only on individuals who have been arrested for a specific category of extremely serious offenses." (emphasis added).

Courts must therefore take great care to apply the BRA and its presumptions as Congress intended—narrowly and to the specific class of offenders it was initially intended to reach. To give significant weight to Congress's limited fact-finding about wealthy drug offenders from four decades ago, when the typical federal drug defendant looked very different from those being charged in large drug cases today, runs afoul of that decidedly narrow approach. *See* Zunkel & Siegler at 292 ("When the BRA was

7

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:25-mj-00376-SCD-JPS     Filed 04/30/25     Page 7 of 17     Document 12

debated, drug prosecutions were not nearly as prevalent as they are today and therefore the drug presumption would not have affected 'a majority of cases.'").

Second, more recent empirical data call into question the factual basis for the presumption in the first place. A government study shows that "the presumption does a poor job of assessing risk" of flight and dangerousness and has "failed to correctly identify defendants who are most likely to be rearrested for any offense, rearrested for a violent offense, [or] fail to appear."[1] This study prompted the Judicial Conference of the United States, led by Chief Justice Roberts, to recommend that Congress limit the presumption's application in drug cases only to people with *two or more* prior serious drug convictions—a criterion which Bea clearly does not satisfy.[2] The Judicial Conference first made this recommendation in 2017 and then made it again in 2020.

It's not surprising that more recent empirical data would contradict the findings made by Congress forty years ago. Not only has the population of people charged with federal drug offenses changed significantly since then, as described above, but the process of pretrial release has as well. At the time the BRA was being debated, the robust national system of pretrial supervision through pretrial services agencies that we have today did not exist. In 1975, Congress passed legislation establishing pretrial services agencies in just ten pilot federal judicial districts on an experimental basis. *See* Judge Donald P. Lay and Jill de La Hut, *The Bail Reform Act of 1984: A Discussion*, William 11

---

[1] Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 Federal Probation 52, 58 (2017), *available at*: https://www.uscourts.gov/sites/default/files/81_2_7_0.pdf.
[2] See Report of the Proceedings of the Judicial Conference of the United States, September 12, 2017, at 10, *available at*: http://www.uscourts.gov/sites/default/files/17-sep_final_0.pdf.

8

Mitchell L. Rev. 4 929, 933. It wasn't until almost ten years later, in 1982, that Congress replaced those ten pilot programs with permanent agencies in *all* judicial districts. *Id.*

Thus, when Congress was debating the need for the BRA to address its concern of pretrial flight and recidivism among certain groups, it did not have the benefit of seeing how effective pretrial supervision could be at addressing those concerns. We now have that information, and we know that pretrial supervision has proven exceptionally effective at diminishing the risk of pretrial recidivism and flight. Indeed, recent statistics from the Administrative Office of U.S. Courts show that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in the 12-month period ending on September 30, 2023, 99% of released federal defendants nationwide appeared for court as required and only 1.1% were rearrested for new felonies.[3] Significantly, this near-perfect compliance rate is seen in both federal districts with very high release rates and those districts with very low release rates.[4] The statistics are consistent here in the Eastern District of Wisconsin, where released federal defendants appeared for court over 99.8% of the time, and only 1.7% of defendants were rearrested for felony offenses while on release, consistent with the national data.[5]

This Court is not constrained by Congress' 40-year-old factual finding about unfathomably wealthy drug traffickers here. Instead, the Court should consider the historical context of the BRA outlined above, the significant limitations Congress had in

---

[3] *See* AO, Judicial Business, *Pretrial Services: Table H-15*, Sept. 30, 2023, *available at* https://www.uscourts.gov/statistics/table/h-15/judicial-business/2023/09/30.
[4] *Id.*
[5] *Id.*

9

*Federal Defender Services of Wisconsin, Inc.*
Case 2:25-mj-00376-SCD-JPS   Filed 04/30/25   Page 9 of 17   Document 12

its fact-finding, and more recent empirical data contradicting that fact-finding, and afford the presumption the appropriate weight once it has been rebutted: very little.

### C. The government's high burden of proving dangerousness by clear and convincing evidence never shifts

Of course, it bears repeating that the ultimate "burden of persuasion always rests with the government." *Wilks*, 15 F. 4th at 846-47; *see also United States v. Boll,* Case No. 2:20-cr-190-PP, at 17 (E.D. Wis. Nov. 8, 2021) (recognizing that once the defendant "'rebuts'" the presumption by coming forward with some evidence that he or she will not flee or endanger the safety of the community, which is not a heavy burden to meet, then the burden remains with the government to persuade the court that the defendant is a danger or poses a risk of non-appearance).

To justify the defendant's detention based on dangerousness, the government must prove by "clear and convincing evidence" that there are no conditions of release that "will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f). That requires the government to demonstrate to this Court "an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *see also United States v. Chimurrenga*, 760 F.3d 400, 405 (2d Cir. 1985) ("this standard of proof requires that the evidence support such a conclusion with a high degree of certainty").

### D. To determine dangerousness, the Court must focus on the future.

In determining whether the government has met its burden of showing that it's "highly probable" that the defendant would endanger the community if released, it's

essential to keep in mind that the issue isn't whether the alleged past conduct is dangerous, but what specific proof there is that the defendant will endanger the community if released under restrictive conditions. The government's burden is to show by clear and convincing evidence that the defendant actually poses a danger if released, not that he in theory poses a danger. *See United States v. Patriarca,* 948 F.2d 789 (1st Cir. 1991).

As the D.C. Circuit emphasized, the defendant's "detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a *concrete, prospective* threat to public safety." *United States v. Munchel¸* 991 F.3d 1273, 1280 (D.C. Cir. 2021) (emphasis added); *see also id.* (Katsas, J., concurring in part and dissenting in part) (characterizing the inquiry as not turning on "any backward-looking assessment" of the defendant's alleged conduct, but on a "specific, forward-looking assessment" of whether the defendants "currently pose an unmitigable threat to public safety"). The Seventh Circuit has long held the same. *See Dominguez*, 783 F.2d at 707 (holding that the dangerousness "finding cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct"); *see also Boll,* at 17, 30-32 (rejecting government's claim that the seriousness of the offense (production of child pornography) establishes a present danger to the community).

Judge Dries acknowledged this in ordering that Bea be released. He noted that now that Bea had been arrested, "the jig was up." And that it seemed substantially more likely that at this critical time, Bea would seek to conform his conduct to the law rather than violate the law. Indeed, that's precisely why the rearrest rates are so low both nationally and in this district.

### E. Doubts must be resolved in favor of release.

If there are doubts regarding the propriety of release, they must be resolved in the defendant's favor. *See United States v. Hammond*, 204 F. Supp. 2d 1157, 1161 (E.D. Wis. 2002) ("Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of release." (internal quotations and citations omitted)); *see also Herzog v. United States*, 75 S. Ct. 349, 351 (1955) (Douglas, J., in chambers) (doubts regarding the propriety of release "should always be resolved in favor of the defendant"). As the Supreme Court held in *Salerno*, "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." 481 U.S. at 755. This presumption of release is encapsulated in the BRA, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "reasonably assure" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States*

*v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention"). Finally, *Wilks* reminds us that "the government's interest in ensuring the safety of the community and securing the defendant's appearance in court" must be balanced against "the defendant's interest in his personal liberty." 15 F. 4th at 847.

### F. The Government has not met its burden of proving dangerousness or risk of flight here.

This Court should follow the recommendation of pretrial services to release Bea under appropriate conditions as the government has failed to prove dangerousness or risk of flight here. First, Bea has rebutted the presumption. Recall that all that is necessary to rebut the presumption is for the defendant to offer "[a]ny evidence . . . of their marital, family, and employment status, ties and role in the community, clean criminal record and other types of evidence" falling within a category listed in § 3142(g). *See Dominguez*, 783 F.2d at 707; *see also United States v. Gamble,* 810 Fed. Appx. 7, 8 (D.C. Cir. 2020) (finding that the district court erred in finding that presumption was not rebutted where defendant "did offer some credible evidence contrary to the statutory presumption," including information that he had a *job offer)*.

Bea has more than satisfied that burden here. He is a high school graduate, has a good employment history, owns his home, and has no prior criminal record. He is in a stable and long-term relationship with an individual who also has no criminal record. The Court should consider he availability of conditions that will address any minimal

13

*Federal Defender Services of Wisconsin, Inc.*
Case 2:25-mj-00376-SCD-JPS     Filed 04/30/25     Page 13 of 17     Document 12

risks, including location monitoring, the recommendation of pretrial services, and the absence of any allegations of violence or threats of violence in his past or associated with this offense.

The next step, then, is for this Court to consider whether the government has met its onerous burden of proving risk of flight or future dangerousness. It has not. The government has not provided any particularized evidence to show that Bea presents a danger to the community *moving forward.* Nor has the government provided evidence that Bea would be incapable of resisting the temptation to engage in criminal activity if released pretrial, especially given the seriousness of the charges hanging over his head and the impact that his conduct while on release could have on plea negotiations or on his sentence if he's convicted.

Moreover, it's not enough for the government to just show some possibility of dangerousness to justify detention. The Seventh Circuit has made clear that "dangerousness alone is an insufficient basis for pretrial detention," and that release is required if that "danger can be reasonably mitigated by release conditions." *Lewis,* 2023 WL 4351244, at *2. The government must prove there are *no conditions* that could mitigate that risk and *reasonably assure* the safety of the community. *See United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("[C]ourts cannot demand more than an objectively reasonable assurance of community safety.") The government cannot meet that burden here, where the Court can address any minimal safety concerns through conditions of release. The government focuses on the fact that Bea's offense involved fentanyl. As an

14

initial point, the defense is not so sure. The substances involved in Bea's arrest appear more like heroin, and the field test for fentanyl is notoriously unreliable.[6] But more to the point, nothing about the dangers of fentanyl Bea may have possessed or sold in the past bears upon his future dangerousness.

Location monitoring, including the GPS ordered by Magistrate Judge Dries, will not only eliminate any serious risk of flight, but also monitor Bea's whereabouts, thereby providing that "natural" discouragement to engage in criminal behavior. Beyond location monitoring, regular reporting to pretrial services, home visits, and phone calls will ensure that Bea is engaged in productive activities. There also are no concerns in this case about witness interference.

The government relies heavily on weight of the evidence as supporting detention, but that consideration deserves minimal weight. First, the better view is that "weight of the evidence," as used in the statute, "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *See United States v. Tawfik,* 852 Fed. Appx. 965, 966 (6th Cir. 2021) (internal quotation and citation omitted): S*ee also United States v. Warneke,* 199 F.3d 906, 908 (7th Cir. 1999) (pretrial detention is based on "risk of flight and danger, and not on the determination of guilt and punishment"). Placing too much emphasis on the offense and the weight of the evidence

---

[6] *See* Ryan Gabrielson, *Unreliable and Unchallenged*, ProPublica (October 2016); *available at*: https://www.propublica.org/article/unreliable-and-unchallenged; Radley Balko, *Why are police departments still using drug field tests?* Washington Post (March 13, 2018) *available at*: https://www.washingtonpost.com/news/the-watch/wp/2018/03/13/why-are-police-departments-still-using-drug-field-tests/; Ryan Gabrielson, *Street Hustle: The Truth Behind the 'New' Police Tool for Confronting Fentanyl Menace*, ProPublica (December 2016), *available at*: https://www.propublica.org/article/truth-behind-new-sirchie-field-test-for-confronting-fentanyl.

15

*Federal Defender Services of Wisconsin, Inc.*

also is akin to applying a presumption of guilt to detain Bea, an application that is forbidden under § 3142(j). Importantly, a defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged," *Dominquez*, 783 F.2d at 706, and "a pretrial detention decision should not effectively prejudge the merits." *Lewis*, No. 23-2137, 2023 WL 4351244, at *1. Which is perhaps why many courts have found that weight of the evidence is the least important factor in the release analysis. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (Kennedy, J.); *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008); *Hammond*, 204 F. Supp. 2d at 1165.

As discussed, the evidence that Bea would pose a danger if released is weak and that remains true regardless of the weight of the evidence. There is no indication that the current charges he is facing are not enough to deter him from participating in drug transactions given everything he would be risking.

Relatedly, the potential penalties do not change that analysis. The government identifies the 40-year mandatory minimum as a factor adding to his flight risk. Over the past several years, there has been an increase in gun and drug cases involving firearms with switches or auto sears that convert a semi-automatic handgun to a fully automatic. That is the charge that brings 30-year consecutive penalty. And though it's been charged several times in the district, the government has not once sought or insisted on a conviction of that charge. Thus, the penalties he faces actually provide a strong deterrent incentive to avoid engaging in illegal conduct.

16

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:25-mj-00376-SCD-JPS    Filed 04/30/25    Page 16 of 17    Document 12

## II. Conclusion

For the above reasons, this Court should follow the recommendation of Pretrial Services and the determination of Magistrate Judge Dries and order Bea's release on bail under appropriate conditions.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2025.

Respectfully submitted,

*/s/ Joshua D. Uller*
Craig W. Albee, WI Bar #1055173
Federal Defender Services
   of Wisconsin, Inc.
411 E. Wisconsin Avenue – Suite 2310
Milwaukee, WI 53202
Tel. (414) 221-9900
Email: joshua_uller@fd.org

*Counsel for Defendant,* Timothy Bea